UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

IN THE MATTER OF THE APPLICATION OF
JOSEPH MILLER, JR.,

                                        Plaintiff,

                                                                    DECISION AND ORDER

                                                                    05-CV-6617L

                   v.

KATHLEEN M. MEHLTRETTER, in her
official capacity as Acting United States
Attorney for the Western District of New York,

                                        Defendant.
_____

          The issue in this case is whether a Department of Justice ("DOJ") official was arbitrary and

capricious in directing an FBI agent to decline to testify or produce documents in a New York State

court proceeding.  This action was commenced under the Administrative Procedure Act, 5 U.S.C.

§§ 701-706.  Plaintiff seeks a finding from this Court that the DOJ official, Acting United States

Attorney Kathleen M. Mehltretter ("Mehltretter"), arbitrarily and capriciously precluded FBI Special

Agent Mark Thompson ("Agent Thompson") from responding to specific inquiries posited by

plaintiff's counsel.

          Plaintiff, Joseph Miller, Jr. ("Miller"), a police officer with the Elmira Police Department,

was charged by indictment in Chemung County Court with serious offenses relating to the theft of

money and property from the Property Clerk's Office at the Elmira Police Department.  Eventually,

on March 18, 2004, Chemung County Court Judge Michael Buckley dismissed the indictment

against Miller in the "interests of justice," N.Y. CRIM. P.L.§ 210.40.  As required by New York statute, under CPL § 160.50(1)(d), whenever a charge is dismissed, a sealing order issues which, among other things, precluded law enforcement agencies from disseminating their documents concerning the prosecution.  In fact, a written sealing order was generated by the Clerk in this case.

In a nutshell, plaintiff contends that in spite of that sealing order, former Chief of Police James Waters ("Chief Waters"), and others connected with the Elmira Police Department, caused certain files and records to be turned over to federal officials, in the hopes that a federal prosecution might ensue.

Because of these allegations, a contempt proceeding against Chief Waters was commenced before Judge Buckley in Chemung County Court.  There were several days of testimony and numerous exhibits received before Judge Buckley.  It was clear that Judge Buckley was interested in the circumstances under which Agent Thompson got certain records, whether he got them from Chief Waters, whether Chief Waters occasioned the New York State Police to turn over their records and, ultimately, whether Chief Waters was in contempt of the sealing order if he engaged in any of those activities.

It is clear that Judge Buckley believed Agent Thompson's testimony to be highly relevant. He so ruled and a subpoena was issued by the Court for Agent Thompson to testify.  On July 1, 2005, plaintiff's attorney sent a detailed letter (Dkt. #8, Ex. D, Mehltretter Aff., ex. A) to Mehltretter setting forth the substance of the testimony that he wished to elicit from Agent Thompson.

The Government moved to quash the subpoena before Judge Buckley (Dkt. #8, Ex. D).  In support of the Government's motion, Mehltretter responded *seriatim*, to each of plaintiff's counsel's requests (Dkt. #8, Ex. E).  Some were not objected to and Agent Thompson testified as to those

matters.   As to many of the requests, though, which Judge Buckley deemed to be relevant, Mehltretter, through Assistant United States Attorney Christopher V. Taffe,[1] directed Agent Thompson not to testify before Judge Buckley.  The state contempt proceeding, therefore, has been stayed to allow plaintiff's counsel to commence this proceeding to review Mehltretter's decision.

Currently pending are the parties' cross-motions for summary judgment (Dkts. ## 7 and 17).

## DISCUSSION

**Sovereign Immunity**

The starting point for analyzing the issues presented before this Court is the doctrine of sovereign immunity.  It is well settled that "the United States and its agencies may not be subject to judicial proceedings unless there has been an express waiver of [sovereign] immunity." *E.P.A. v. General Elec. Co.*, 197 F.3d 592, 597 (2d Cir.1999) ("*EPA I*") (citing *Block v. North Dakota ex rel. Bd. of Univ. and School Lands*, 461 U.S. 273, 287 (1983)); *see also In re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 190 (2d Cir.2004) ("Absent a waiver of sovereign immunity, a federal agency, as representative of the sovereign, cannot be compelled to act.") (internal quotation marks omitted).

In the case at bar, plaintiff seeks to compel Mehltretter to authorize Agent Thompson's testimony concerning matters within the scope of the County Court subpoena.  To maintain this action and to obtain the relief requested, there must be a waiver of sovereign immunity.

This waiver of immunity is found in the Administrative Procedure Act ("APA"), at 5 U.S.C. § 702, which provides that:

---

[1] This action originally was brought against Mehltretter and Taffe.  At a hearing on the pending motions, held January 24, 2007, the parties stipulated to dismissing the action against Taffe, with prejudice, pursuant to FED. R. CIV. P. 41.

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

The United States, therefore, has consented to be sued under the circumstances presented in this case. *See Glotzer*, 374 F.3d at 190 ("a motion to compel agency compliance with a subpoena qualifie[s] as an 'action' seeking review of 'agency action' for purposes of APA § 702, and, therefore,… a federal court's consideration of such a motion [does] not violate sovereign immunity.") (citing and upholding *EPA I*, 197 F.3d at 599); *Abdou v. Gurrieri*, No. 05-CV-3946, 2006 WL 2729247 (E.D.N.Y. Sept. 25, 2006) (reviewing under APA § 702 the decision of the DOJ not to produce documents pursuant to subpoena, and holding that such proceedings did not violate sovereign immunity).

## Review of Agency Action Under the APA

The United States' consent to be sued, however, is limited. Pursuant to § 706 of the APA, a federal court may "hold unlawful and set aside agency action, findings, and conclusions" only if it finds them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its own judgment for that of the agency." *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Furthermore, the agency action under review is "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977).

The Second Circuit has characterized the court's review under the APA as "particularly deferential." *Envtl. Def. v. E.P.A.*, 369 F.3d 193, 201 (2d Cir.2004). In this respect, the court "may

not assess the wisdom of an agency's choice; inquiry is limited instead to whether the [agency] has made a clear error of judgment." *Falk v. Sec'y of the Army*, 870 F.2d 941, 945 (2d Cir.1989). Moreover, the burden of persuasion is on the party challenging the agency's decision. *Frisby v. U.S. Dep't of Hous. and Urban Dev.*, 755 F.2d 1052, 1055 (3d Cir.1985).

**The DOJ's *Touhy* Regulations**

In the instant case, Mehltretter decided not to authorize Agent Thompson's testimony regarding specific matters within the scope of the County Court subpoena. Her decision was based on the application and interpretation of the DOJ's "*Touhy*" regulations, set forth at 28 C.F.R. § 16.21 *et seq.*[2]

Pertinent in this case are 28 C.F.R. §§ 16.22 and 16.26. Section 16.22(a) provides that,

> In any federal or state case or matter in which the United States is not a party, no employee or former employee of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official . . . .

---

[2] Pursuant to the Federal Housekeeping Statute, 5 U.S.C. § 301, the DOJ has prescribed regulations regarding, *inter alia*, "the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." Known as its "*Touhy*" regulations, based on a Supreme Court case of the same name, *see United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), such regulations have been recognized as a valid exercise of the agency's authority to restrict the testimony of its employees, as well as the disclosure of departmental files and documents. *See Boron Oil Co. v. Downie*, 873 F.2d 67, 69 (4th Cir.1989) ("The Supreme Court has specifically recognized the authority of agency heads to restrict testimony of their subordinates by this type of regulation.").

Section 16.26 then enumerates the factors the DOJ official must consider in determining whether production or disclosure should be made pursuant to a demand,[3] and provides as follows:

(a) In deciding whether to make disclosures pursuant to a demand, Department officials and attorneys should consider:

(1) Whether such disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose, and

(2) Whether disclosure is appropriate under the relevant substantive law concerning privilege.

(b) Among the demands in response to which disclosure will not be made by any Department official are those demands with respect to which any of the following factors exist:

(1) Disclosure would violate a statute, such as the income tax laws, 26 U.S.C. 6103 and 7213, or a rule of procedure, such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e),

(2) Disclosure would violate a specific regulation;

(3) Disclosure would reveal classified information, unless appropriately declassified by the originating agency,

(4) Disclosure would reveal a confidential source or informant, unless the investigative agency and the source or informant have no objection,

(5) Disclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired,

(6) Disclosure would improperly reveal trade secrets without the owner's consent.

---

[3] There is no dispute that the County Court subpoena in this action constituted a proper "demand" within the meaning of the regulations. *See* 28 C.F.R. § 16.21(a)(2). Nor is there any dispute that the parties followed the proper administrative procedures under the regulations once the demand was made. *See id.* at §§ 16.22(b)-(d); 16.24; *see also* Dkt. #8, Ex. D, Mehltretter Aff. ¶2.

**Subpoenaed Testimony and Documents**

The subpoena here sought testimony and documents from Agent Thompson regarding events that occurred during a three-moth time period between March 2, 2004 and May 31, 2004.  In all, plaintiff's requests concerned 13 discrete areas of inquiry ("Requests 1-13"). (*See* Dkt. #8, Ex. D, Mehltretter Aff., ex. A; Ex. E, Mehltretter MOL).

Mehltretter had no objection to four of the Requests (2, 3, 4, and 5). She authorized Agent Thompson to give testimony regarding the dates when documents were obtained from the New York State and the Elmira Police Departments, the places from where those documents were obtained and a general identification of those documents. (Requests 2-4).  She also had no objection to Request 5, which asked whether and from whom Agent Thompson received copies of the grand jury testimony given in the *state* prosecution.

The dispute here concerns Mehltretter's objections to Requests 1, and 6 through 13. Mehltretter relied on 28 C.F.R. §§ 16.26(a), 16.26(b)(1), and 16.26(b)(5) as the basis for her decision not to authorize Agent Thompson's testimony.  As detailed in United States' motion to quash (Dkt. #8, Ex. E), Mehltretter cited the grand jury secrecy rule (FED. R. CRIM. P. 6[e]), the Privacy Act (5 U.S.C. § 552a), and the law enforcement and deliberative process privileges as reasons for not allowing Agent Thompson to testify.  Mehltretter also objected to the requested testimony based on its relevancy and the overly burdensome scope and nature of the Requests. (Dkt. #8, Ex. D, Mehltretter Aff. ¶¶ 3-4).

The task of the Court is to ascertain whether Mehltretter made "a clear error in judgment" in refusing to allow Agent Thompson to testify or to produce documents in response to these Requests, which are discussed *seriatim. See Falk*, 870 F.2d at 945.  According to the Second Circuit,

this determination turns on "whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a 'rational connection between the facts found and the choice made.'" *J. Andrew Lange, Inc. v. F.A.A.*, 208 F.3d 389, 391 (2d Cir.2000) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 163 (2d Cir.2003).

**Request 1.    Nature and dates of all contacts between Agent Thompson and members of the New York State Police, the Elmira Police Department, and any employee of the City of Elmira, including Corporation Counsel John Ryan.**

Mehltretter permitted Agent Thompson to testify as to the nature and dates of his contacts with the Elmira Police Department (including with Chief Waters) and the New York State Police regarding Agent Thompson's receipt of records concerning Miller.   As to any other testimony, however, Mehltretter objected based on relevancy, scope, the burdensome efforts required to respond, and the law enforcement privilege.

Thus, at the proceeding on August 10, 2005, Agent Thompson testified that he received from the New York State Police[4] on March 27, 2004, a copy of its investigative file on Miller ("the NYSP file") by going in person to the New York State Police barracks in Horseheads, New York.[5] He further testified that the NYSP file included copies of numerous documents generated by the Elmira Police Department concerning the investigation of Miller, including affidavits, reports,

---

[4]  Although Agent Thompson first received from the State Police copies of documents that were subject to the seal order, no State Police officials were charged with contempt, although a number of State Police officials were called to testify at the contempt proceeding before Judge Buckley.

[5]  He was not permitted, however, to testify as to how he knew, more than a year later, the date that this occurred.

evidence tags, Drug Enforcement Unit complaint reports, evidence and valuables safe logs, property records, and arrest reports. (Dkt. #8, Ex. H, at pp.1663-76).

Agent Thompson also testified that on April 28, 2004, he went to Chief Waters' office and obtained from him the Elmira Police Department records concerning Miller pursuant to a federal grand jury subpoena issued the previous day.[6] (*Id.* at 1683). According to Agent Thompson, approximately two or three weeks before April 28, 2004, he had a conversation with Chief Waters about obtaining the Elmira Police Department records. (*Id.* at 1687). He could not say for certain when that conversation occurred.

Moreover, Agent Thompson testified that 90% or more of the records from the Elmira Police Department had been contained in the NYSP file that he already had in his possession. (*Id.* at 1689). The other 10% of the records obtained from Waters pursuant to the federal grand jury subpoena consisted primarily of internal memoranda, e-mails and summaries, copies of which were not in the NYSP file.

Mehltretter, however, did not permit Agent Thompson to testify about whether he spoke with James Newell of the State Police in March 2004 (as indicated in Newell's notes which were admitted into evidence); about whether he had a conversation with Mark Lincoln of the State Police at the March 23, 2004 meeting in Rochester about procuring the NYSP file; whether he had a conversation with Waters or Drake before obtaining the NYSP file; or whether he spoke with anyone at the State Police barracks when he picked up the NYSP file. Nor was he permitted to testify about whether he spoke with City Corporation Counsel John Ryan in March or April 2004; whether he

_____

[6] A copy of the federal grand jury subpoena, which was directed to Chief Waters and dated April 27, 2004, was admitted into evidence in the County Court contempt proceeding. (*Id.* at 1684). It was not, however, made part of the record before this Court.

spoke with Deputy Chief Drake on April 5, 2004 regarding the failure of Ryan to get him copies of the internal investigation files from the Elmira Police Department; whether he told Waters on April 5, 2004, that the ball was in Ryan's court and that Agent Thompson "needed the files to get going" on the investigation, so that the U.S. Attorney's office would not "lose interest." (*Id*. at 1658-66; 1682-83). In each instance, Mehltretter raised an objection to this testimony based on the law enforcement privilege.

To the extent that Request 1 sought evidence about cases or investigations other than the one concerning Miller, Mehltretter's objection is neither arbitrary nor capricious. As framed, Request 1 would encompass *any* contacts Agent Thompson had during the relevant three-month period with the State Police, the City of Elmira or the Elmira Police Department regarding *any* investigation or case. That is clearly beyond the scope of the contempt proceeding and would be unduly burdensome.[7]

To the extent that Request 1 sought evidence about the nature and dates of all contacts Agent Thompson had with the State Police, the City and the Elmira Police Department about *any* aspect of the Miller investigation, I also find that Mehltretter's determination is proper. I agree that testimony from Agent Thompson concerning the full scope of the federal investigation of Miller would be barred by the law enforcement privilege.

To the extent, however, that Request 1 sought testimony regarding the nature and dates of contacts with the State Police, the City and the Elmira Police Department about the circumstances

---

[7] It also calls for information that clearly would fall within the purview of the law enforcement privilege, discussed *infra*.

that led to his receipt of the NYSP file and the Elmira Police Department records, I find that Mehltretter's objection was unfounded and without a rational basis.

### Law Enforcement Privilege

Mehltretter's objection was based on the law enforcement privilege. This privilege is designed "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of the City of New York v. Myerson*, 856 F.2d 481, 484 (2d Cir.1988). It bars disclosure of facts, and is "based primarily on the harm to law enforcement efforts which might arise from public disclosure of … investigatory files." *See Black v. Sheraton Corp. of America*, 564 F.2d 531, 541 (D.C.Cir.1977); *see also U.S. v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981).

The privilege is qualified, however, and "there is a need to balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information." *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C.Cir.1984); *see also Borchers v. Commercial Union Assur. Co.*, 874 F.Supp. 78, 79-80 (S.D.N.Y. 1995); *U.S. v. Davis*, 131 F.R.D. 391, 395 (S.D.N.Y.1990).

When the information sought is "both relevant and essential" to the presentation of the case on the merits and "the need for disclosure outweighs the need for secrecy," the privilege is overcome. *In re Search of Premises Known as 1182 Nassau Averill Park Rd.*, 203 F.Supp.2d 139, 140 (N.D.N.Y.2002). "Whether the showing of relevance and need rises to the requisite level is a

discretionary determination that must necessarily be made on a case-by-case basis." *Kitevski v. City of New York*, No. 04 Civ. 7402, 2006 WL 680527, *3 (S.D.N.Y. Mar. 16, 2006).

I find that Mehltretter made a clear error in judgment in limiting the scope of the permitted testimony to *only* the facts regarding when and from whom Agent Thompson actually received the NYSP file and the Elmira Police Department records. Mehltretter did not permit inquiry into how the records were obtained, with whom Agent Thompson spoke to obtain the records, the nature of those conversations, or (as it relates to Request 7, *infra*) whether the seal order was ever discussed. Further, Mehltretter refused to allow Agent Thompson to testify about the nature and dates of *any* contact he had with the City, including Corporation Counsel Ryan.

Mehltretter's determination that such testimony would undermine law enforcement efforts is based on her assertion that any questioning of Agent Thompson:

> that tends to display his daily confidential and professional relationships with members of local law enforcement presumably will have a seriously adverse impact on his ability to continue in the mission of the FBI. Trust and accessibility are two of the hallmark qualities that ensure continued positive relationships between the FBI and local law enforcement. Compelling [Agent] Thompson to testify about matters that arise from those relationships is tantamount to causing him to unilaterally breach those confidences and will eventually lead to a systemic erosion of that relationship and the trust he and other FBI special agents enjoy with the local law enforcement community.

(Dkt. #8, MOL, p. 10) (emphasis supplied). This reasoning is not a satisfactory explanation considering the circumstances in this case.

First, Mehltretter does not explain why disclosure of contacts with *City* officials (and not local law enforcement) would implicate the law enforcement privilege. Instead, she makes only "vague and conclusory statements without any specific or particularized facts" to support her claim

that the testimony about contacts with City employees (including Ryan) would be privileged. *Kitevski*, 2006 WL 680527, at *3.

Second, she did not explain "how disclosure will undermine law enforcement efforts and reveal law enforcement techniques." *Id*. There has been no showing that "the values underlying the law enforcement privilege are implicated in this case." *United States v. United States Currency in Sum of Twenty One Thousand Nine Hundred Dollars*, No. 98 CV 6168L, 1999 WL 993721, at *3 (E.D.N.Y. Sept. 21, 1999). Importantly, Mehltretter does not assert that any specific issue of confidentiality of sources, or the need to protect witnesses or law enforcement personnel from harm, would arise based on the disclosure of the information sought. *Myerson*, 856 F.2d at 484; *Borchers*, 874 F.Supp. at 79-80.

For instance, in *Borchers*, after an *in camera* review of the requested files, the Court refused to allow plaintiffs to discover the contents of arson investigation reports prepared by Fire Department of New York. The Court found that disclosure was barred by the law enforcement privilege because the records "reflect the scope of [a] criminal investigation, as well as the identity and substantive testimony of various witnesses" who, the Court reasoned, could have been put in jeopardy by disclosing their identities or the substance of their statements themselves. *Borchers*, 874 F.Supp. at 80. In the case at bar, however, there has been no assertion that the same concerns would be implicated by Agent Thompson's testimony.

Nor did Mehltretter offer a satisfactory explanation for how such testimony would "disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." 28 C.F.R. § 16.26(b)(5). As plaintiff points out, much of the "techniques and procedures" pertinent to

- 13 -

Agent Thompson's procurement of the NYSP file and Elmira Police Department records already have been disclosed in proceedings before Judge Buckley.

The need for continued secrecy of these matters, therefore, has been diminished in this case. There is no dispute that considerable testimony and evidence had been introduced in the proceedings before Judge Buckley about the fact that Agent Thompson received a copy of State Police and Elmira Police Department records, that there were meetings and conversations with state and local law enforcement officials, and that a federal grand jury subpoena had been issued.  Further, there has been testimony by several witnesses regarding the nature and dates of contacts between the Elmira Police Department, State Police and Agent Thompson. Chief Waters, Deputy Chief Drake, and City Corporation Counsel Ryan have already testified.  Copies of emails between members of the Elmira Police Department and other conversations between persons with knowledge are already in evidence.

Plaintiff wants to know about the nature and dates of any contact with the State, the City, or the Elmira Police about the circumstances leading to Agent Thompson's receipt of records on Miller.  That limited inquiry does not start a slide down the slippery slope advanced by Mehltretter in her motion to quash, particularly when she has already permitted Agent Thompson to testify regarding contacts with the State Police and the Elmira Police Department about obtaining records on Miller.

Moreover, the federal investigation of Miller seems to have been closed by the time that Mehltretter made the determination not to permit Agent Thompson to testify in response to this Request.  In the Memorandum of Law in support of the motion to quash, Mehltretter states that "a

decision to not prosecute Miller was made by the United States Attorney's Office in 2005." Mehltretter signed this document on July 28, 2005.[8]

The fact that an investigation is closed does not automatically mean that the party seeking disclosure is entitled to access otherwise privileged items from a criminal investigation. *See Borchers*, 874 F.Supp. at 80 ("[D]isclosure of informants' statements may interfere with the ability of the F.D.N.Y. to secure the cooperation of other informants in future investigations. The importance of confidentiality to any informant who has assisted the F.D.N.Y. does not disappear with the closure of an investigation. If that were true, then the promise of confidentiality would be so severely circumscribed and temporary as to be quite hollow."). Nevertheless, the status of an investigation is an important factor when determining whether disclosure of facts pertinent to that investigation could impede it.

Nor is the need for continued secrecy paramount to the interests advanced by the disclosure of the information in the contempt proceeding. The County Court is investigating whether Chief Waters wilfully violated, or caused the wilful violation of, a Court order. This is an important proceeding.

There is no dispute that the vast majority of the Elmira Police Department records were already contained in the NYSP file that Agent Thompson obtained on March 27, 2004. Plaintiff alleges that Agent Thompson's procurement of the NYSP file violated the seal order. I agree with plaintiff that, to the extent Agent Thompson's testimony would reveal confidences that Waters, or

---

[8]  In fact, plaintiff's counsel represented at the County Court proceeding that Elmira City Manager Iraci had testified that Agent Thompson contacted him sometime before August 10, 2005, and told him that the federal investigation into Miller was closed. Agent Thompson was not permitted to answer when asked whether this conversation took place. (Dkt. #8, Ex. H, p. 1681-82).

others, knowingly breached the County Court's seal order, such information is not the type that the law enforcement privilege is designed to protect.  Further, the interest in disclosure of such information outweighs the need to keep it private.  *Kitevski*, 2006 WL 680527, at *3-*4 (finding on balance, that the need for disclosure of internal affairs bureau records from the New York City Police Department in a case alleging civil rights violations by the Department outweighed the need for nondisclosure pursuant to law enforcement privilege).

Therefore, Mehltretter's determination regarding Request 1 is not arbitrary and capricious to the extent that it sought evidence regarding the nature and dates of contacts about cases other than Miller's.  Nor is it arbitrary and capricious to the extent that Request 1 sought information about the Miller investigation besides what is identified above as relevant to the contempt proceedings.  On balance, the need for Miller to obtain information about the investigation other than what pertains to his procurement of the NYSP file and Elmira Police Department records does not outweigh the need for the DOJ to keep this information privileged.

Mehltretter's determination not to allow Agent Thompson to testify about the nature and dates of contacts with the State Police, City of Elmira, and Elmira Police Department regarding the circumstances surrounding procuring the NYSP file and the Elmira Police Department records, however, is reversed.  Mehltretter is compelled to permit Agent Thompson to testify as to these matters, consistent with the Court's findings set forth above.

**Request 6.    Manner in which the dates, names and places given in response to Requests 1-5 have been established (i.e. records, contact sheets, recollection, or talk with other people to refresh recollection).**

Request 6 sought testimony from Agent Thompson regarding how he was able to respond accurately to Requests 1-5.  Request 1 is set forth, *supra*.  In Requests 2-5, plaintiff sought, and

Agent Thompson was permitted to testify about, the dates when documents, including *state* grand jury testimony, were obtained from the New York State and Elmira Police Departments, the places from where those documents were obtained and a general description of the documents obtained.

Mehltretter refused to allow Agent Thompson to give that testimony based on the form of the question, its scope, relevance, and the law enforcement privilege.  For instance, when asked by plaintiff's counsel whether he had any records from which he was able to establish the dates of contacts with the Elmira Police Department, how he established that it was on March 27, 2004, that he obtained the NYSP file, whether he got a receipt from the State Police when he obtained the records, and whether he signed any documents indicating that he had picked up the records from the State Police, he was not permitted to answer.  (Dkt. #8, Ex. H, at pp. 1665-68).

I find that Mehltretter's determination with respect to Request 6 is rational and well-founded. Plaintiff has failed to show that there was a clear error of judgment in refusing to allow Agent Thompson to testify as to these matters.  FBI record-keeping practices, which necessarily are part of the techniques and procedures utilized in an investigation, are not open to public scrutiny absent a compelling need for the information. *See Abdou*, 2006 WL 2729247, at *3 (holding that "FBI reference numbers, case identification numbers, review and approval chain of command names, information regarding precedence and priority of the investigation, lead information and process and timing of the investigation" were subject to law enforcement and investigatory file privileges).

Here, it is unclear why plaintiff would need this information when the testimony regarding when the documents were disclosed is in evidence.  There has been no allegation that Agent Thompson's testimony that he received the NYSP file on March 27, 2004, was untruthful or suspect. Thus, the need for nondisclosure of an FBI Agent's record-keeping or investigative techniques is

paramount to whatever minimal need plaintiff may have for this information.  I find, therefore, that the law enforcement privilege was a rational basis to preclude Agent Thompson from testifying in response to this Request.

**Request 7.     Date and circumstances when and under which Agent Thompson learned of the New York State Court seal order.**

In response to Request 7, Mehltretter objected based on scope, relevance, and the law enforcement privilege, and claimed that "the conduct of [Agent] Thompson is not at issue in the pending [contempt] proceeding.  Thus, what he knew and when he knew it is not germane to the pending litigation. [Agent] Thompson is not authorized to testify in response to any question in this category."  (Dkt. #8, MOL, p. 13).

I find that Mehltretter failed to give a satisfactory explanation for not permitting Agent Thompson to testify in response to this Request.  The issue in the contempt proceeding is whether Waters wilfully violated the seal order, or wilfully caused it to be violated, when 90% of the Elmira Police Department records were disclosed to Agent Thompson by the State Police.  The date when and circumstances in which Agent Thompson learned of the seal order is germane to these issues. Mehltretter has not articulated how the principles advanced by the law enforcement privilege would be implicated if the circumstances surrounding Agent Thompson's knowledge of the seal order were disclosed.

Mehltretter's determination regarding Request 7 was arbitrary and capricious.  Mehltretter is compelled to permit Agent Thompson to testify in response to Request 7.

**Request 8.     When and under what circumstances the use of a Grand Jury subpoena first was raised and thereafter pursued with New York State Police and/or Elmira Police Department Officials.**

- 18 -

**Request 10.    Why the Elmira Police Department records were subpoenaed after the substantially similar New York State Police file including substantially the same records already had been obtained.**

In response to Requests 8 and 10, Mehltretter objected on the grounds of scope, relevance, the grand jury secrecy rule, and the deliberative process and law enforcement privileges. I address these Requests together, as they are interrelated.

### *Grand Jury Secrecy Rule*

I find that Mehltretter's determination to withhold testimony sought in Requests 8 and 10 based on the grand jury secrecy rule cannot be upheld. Mehltretter refused to permit Agent Thompson to testify "regarding any matters occurring before a federal grand jury," citing FED. R.CRIM. P. 6(e).

There is no dispute that proceedings before a grand jury generally remain secret. *See In re Biaggi*, 478 F.2d 489, 491 (2d Cir.1973). The so-called "grand jury secrecy rule," codified at FED. R. CRIM. P. 6(e), bars disclosure of "a grand-jury matter" absent a court order. The rule serves significant and historical functions, including protecting grand jurors, encouraging "free and untrammeled disclosures" by witnesses with relevant information about the commission of crimes, protecting criminal investigations, and preventing the escape of those under investigation. *See In re Petition of Craig*, 131 F.3d 99, 101-102 (2d Cir.1997) (and cases cited therein). Nevertheless, the rule has its exceptions and there are a number of circumstances when disclosure of grand jury matters is appropriate. District Courts, "as part of their supervisory authority over the grand juries that they have empaneled, are explicitly given the discretion to determine whether . . . disclosure of records is appropriate." *Id*. at 102.

Here, Mehltretter's reliance on the grand jury secrecy rule is not a satisfactory explanation for objecting to Agent Thompson's testimony in response to Requests 8 and 10, which do not seek what occurred before the grand jury.  Plaintiff seeks information concerning what happened *prior* to the commencement of a grand jury investigation and *prior* to the issuance of a grand jury subpoena (*See* Dkt. #8,  Thompson's Aff., ¶3-4 "On or about April 28, 2004, a federal grand jury investigation was commenced into these allegations.").

In any event, it makes little sense that events leading up to the issuance of a grand jury subpoena would fall within the purview of the grand jury secrecy rule, when the actual scope and subject of the grand jury investigation itself, as well as the subpoena issued and the contents of the information it sought, are no longer secret.  It was no longer secret that, on April 28, 2004, pursuant to a grand jury subpoena issued April 27, 2004, Waters gave Agent Thompson the Elmira Police Department records on Miller.  That fact was contained in Agent Thompson's affidavit[9] in support of the motion to quash.  The federal grand jury subpoena issued was introduced in evidence and made an exhibit in the contempt proceeding.  Nor was it a secret in 2005, when plaintiff sent the

---

[9]  In his affidavit in support of the United States' motion to quash, dated July 27, 2005, Agent Thompson states that beginning in October 2002, he was involved in "an investigation involving allegations of the theft of monies by one or more employees of the Elmira Police Department, Elmira, New York. …  If the allegations proved to be true, they may establish a violation of [18 U.S.C. § 666], as well as other possible federal statutes.  On or about April 28, 2004, a federal grand jury investigation was commenced into these allegations.  On that date, a federal grand jury subpoena was issued to the Elmira Police Department for records pertaining to this investigation.  It was necessary for the federal grand jury to review the records possessed by the Elmira Police Department as well as other sources to determine if violations of federal law have occurred.  Inasmuch as the allegations involve the misuse of monies in the custody of the Elmira Police Department, that agency was the best and likely only source for original documents (accounting reports, reports of interviews, custody reports, etc) which were necessary to conduct this investigation.  Without having access to such documents, the federal grand jury investigation of the alleged federal offenses would be impeded." (Dkt. #8, Thompson Aff., ¶3-4).

demand to Mehltretter, that plaintiff had been under investigation by the FBI and a federal grand jury. Furthermore, a decision had already been made by federal authorities not to prosecute Miller and the investigation was closed before Agent Thompson testified.

To the extent that Mehltretter withheld the testimony of Agent Thompson in response to Requests 8 and 10 based on the grand jury secrecy rule, that determination must be overturned.

### *Deliberative Process Privilege*

I find, however, that Mehltretter's determination that the information responsive to Requests 8 and 10 is shielded by the deliberative process privilege is well reasoned and supported by sufficient explanation.

The deliberative process privilege shields information "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C.1966), *aff'd memo. sub nom. V.E.B. Carl Zeiss, Jena v. Clark*, 384 F.2d 979 (1967); *see also Winner*, 641 F.2d at 831. "[T]he so-called 'mental process rule' impresses the stamp of secrecy … to all phases of the decision-making process, of which the advice is a part. … [It] operate[s] to preserve the integrity of the deliberative process itself. It is evident that to demand pre-decisional data is at once to probe and imperil that process." *Id.* at 326. The privilege applies to "confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice." *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987).

Mehltretter determined that documents and evidence that tended to show how or why a decision was made by Agent Thompson or the U.S. Attorneys Office to use a Grand Jury subpoena were subject to the deliberative process privilege. (Dkt. #8, MOL, at p. 15). I conclude that this is

a satisfactory explanation for disapproving Agent Thompson's testimony in response to these Requests.

Evidence regarding the basis or strategy of prosecutorial decisions or investigations is rarely subject to disclosure. *See Startzell v. City of Philadelphia*, Civ. No. 05-05287, 2006 WL 2945226 *2-*3 (E.D.Pa. Oct. 13, 2006) (finding that testimony regarding how "the D.A.'s Office works with the Department of Police to bring criminal charges" was subject to the deliberative process privilege); *Thompson v. Lynbrook Police Dept.*, 172 F.R.D. 23 (E.D.N.Y. 1997) (memoranda that referred to "the steps taken by the assistant district attorneys in completing their investigation, . . . and their recommendations to the file and to higher-ranking officials within the Office of the District Attorney on what, if any, action should be taken" were not discoverable under the deliberative process privilege.).

When, under what circumstances, and why a federal grand jury subpoena issued for the Elmira Police Department records asks for information that falls well within the deliberative process privilege.  Moreover, Miller's need to obtain this information does not outweigh the interests in keeping this information privileged. *See Carl Zeiss Stiftung*, 40 F.R.D at 329.  Given the deferential standard of review under the APA, I will not set Mehltretter's determination aside based on this privilege.[10]

---

[10]  Because I find that Mehltretter properly determined that the deliberative process privilege barred disclosure of this information, I need not decide whether her reliance on the law enforcement privilege was equally supported.

**Request 9.      What happened at the meeting in Rochester, New York which occurred on March 23, 2004 at the U.S. Attorney's Office involving Elmira Police Department officials, Elmira Corporate Counsel, New York State Police representative and U.S. Attorney representatives?**

In response to Request 9, Mehltretter objected on the grounds of scope, relevance, and the deliberative process privilege.

Mehltretter's determination regarding the scope and relevance of this very broad question should not be disturbed, except as noted below.  I also find that her reliance on the deliberative process privilege is rational and that she provided a sufficient explanation for not disclosing the nature of the meeting between federal investigators, State and local law enforcement agencies, and federal prosecutors, with one exception.

As I discussed with respect to Request 1, I find that Miller's need to obtain testimony about the knowing violation of the seal order outweighs the need to prevent disclosure of evidence regarding conversations about the seal order that occurred at that meeting.  There has already been some testimony from Deputy Chief Drake and Corporation Counsel Ryan that there was discussion of the seal order at the March 23, 2004 meeting in Rochester.

To the extent that Mehltretter declined to allow Agent Thompson to testify about conversations that took place at that meeting regarding the seal order, that decision is arbitrary and capricious and she is compelled to allow it.

**Request 11.      Conversations with James Waters and/or Scott Drake concerning then Chief Waters' unhappiness with the New York State Court dismissal of March 18, 2004.**

In response to Request 1, Mehltretter objected on the grounds of scope, relevance, and the law enforcement privilege.

Plaintiff argues that this testimony is relevant because, assuming Waters was "unhappy" about the dismissal by Judge Buckley of the charges against Miller, it would show that he had motive to wilfully disobey the seal order automatically generated by Judge Buckley's dismissal.

Mehltretter claims that allowing this testimony would reveal the nature and scope of a federal investigation under the law enforcement privilege.  I disagree, and find that this is not a rational explanation for withholding the testimony, for substantially the same reasons discussed regarding Request 1.

If Agent Thompson has pertinent testimony to give that Waters was "unhappy," that testimony would be germane to the issues before the County Court.  I fail to see how that information would reveal the "nature and scope of a federal investigation," at least to any greater degree what has already been revealed.

**Request 12.     Any follow-up questions which the Court may be interested in relative to these issues.**

Mehltretter's determination not to allow Agent Thompson to testify to any follow-up questions related to the approved subject areas was arbitrary and capricious.  Request 12 does not violate 28 C.F.R. § 16.22 because, by definition, a "follow-up" question would only be related to previously-approved areas of inquiry.

Mehltretter, therefore, is compelled to allow Agent Thompson to testify to follow-up questions that are consistent with and directly related to the subject areas previously approved by her or that she was compelled to approve in this Decision and Order.

**Request 13.     Production of all documents, etc. that refer to contacts with Waters, the Elmira Police Department, the State Police, or the City Corporation Counsel's office pertaining to Miller from March 1, 2004 and May 31, 2004.**

In response to Request 13, Mehltretter objected on the grounds of scope, relevance, grand jury secrecy rule, and the law enforcement and deliberative process privileges.

In order for the Court to make a proper determination of the issues raised in response to Request 13, an *in camera* inspection is necessary.

> Although the decision of whether to engage in *in camera* review rests in the sound discretion of the district court, *Estate of Fisher v. C.I.R.*, 905 F.2d 645, 651 (2d Cir.1990), *in camera* review is particularly encouraged in cases invoking governmental claims of privilege. *See, e.g., Kerr v. United States District Court*, 426 U.S. 394, 406, 96 S.Ct. 2119, 2125, 48 L.Ed.2d 725 (1976) (suggesting *in camera* review is a "highly appropriate and useful means of dealing with claims of governmental privilege"); *United States v. Nixon*, 418 U.S. 683, 706, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (*in camera* review of documents sought by special prosecutor appropriate in light of claim of presidential privilege).

*Borchers*, 874 F.Supp. at 79-80.

Mehltretter is compelled to produce to the Court for *in camera* inspection any documents from Agent Thompson's investigative file that refer to the nature and date of his contacts with Waters, the Elmira Police Department, the State Police, or the City Corporation Counsel's office concerning Miller between March 1, 2004 and May 31, 2004.

## CONCLUSION

Plaintiff's motion for summary judgment (Dkt. #7) is granted in part and denied in part.

Defendant's cross-motion for summary judgment (Dkt. #17) is granted in part and denied in part.

Defendant is compelled to authorize Agent Thompson's testimony in response to Requests 1, 7, 9, 11 and 12 consistent with this Decision and Order.  Defendant further is ordered to produce for *in camera* inspection, on or before **April 9, 2007**, documents responsive to Request 13 consistent with this Decision and Order.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
March 19, 2007.